UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
*************************************
                                    *
Michael J. Fiorello,                *
          Plaintiff,                *
                                    *
     v.                             *     Civil Case No.: 1:25-cv-322
                                    *
Thomson Reuters (Tax & Accounting) Inc.  *   **JURY TRIAL REQUESTED**
          Defendant                 *
                                    *
*************************************
```

## COMPLAINT

### I.    NATURE OF THE ACTION

1.    This action is brought by Plaintiff Michael Fiorello against Defendant Thomson Reuters for violation of the Americans with Disabilities Act, Amendments Act of 2008 (the "ADA"), violation of the New Hampshire Law Against Discrimination (N.H. RSA 354-A), violation of the Family and Medical Leave Act (the "FMLA"), Wrongful Termination in violation of public policy, and violation of the New Hampshire Whistleblower Protection Act (N.H. RSA 275-E:2).

2.    The Plaintiff seeks a jury trial in this matter.

### II.    JURISDICTION AND VENUE

3.    Jurisdiction over the Plaintiff's ADA (42 U.S.C. § 12112, et al.) and FMLA (29 U.S.C. § 2601, et seq.) claims is proper pursuant to 28 U.S.C. § 1331.  The Court may exercise pendent jurisdiction over the Plaintiff's state law claims for violation of N.H. RSA 354-A, violation of N.H. RSA 275-E:2, and wrongful termination in violation of public policy.

4.    Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the Plaintiff's claims occurred in New Hampshire.

1

5.     The Plaintiff has exhausted his administrative remedies with the New Hampshire Commission for Human Rights and Equal Employment Opportunity Commission (the "EEOC") to the extent required by law, as is evidenced by the Dismissal and Notice of Rights letter from the EEOC, dated June 18, 2025, and received by Plaintiff's counsel on June 18, 2025, enclosed herewith at Exhibit 1.

### III.    PARTIES

6.     Plaintiff Michael Fiorello is a New Hampshire resident with an address of 50 Pelham Road, Salem, New Hampshire 03079.

7.     Defendant Thomson Reuters (Tax & Accounting), Inc., is a foreign for-profit corporation registered in the State of Texas, with a principal office address of 6160 Warren Parkway, Suite 700, Frisco, TX 75034, and a mailing address of 2900 Ames Crossing Road, Suite 100, Eagan, MN 55121-2498.

8.     Defendant Thomson Reuters (Tax & Accounting), Inc., has a Registered Agent in New Hampshire: Corporation Service Company, of 10 Ferry Street, Suite 313, Concord, NH 03301.

9.     Thomson Reuters is a covered employer pursuant to N.H. RSA 354-A and the ADA because it employed fifteen or more employees for at least twenty weeks during the calendar year at issue in this case and/or the prior calendar year.

10.    Thomson Reuters is a covered employer pursuant to the FMLA because it employed fifty or more employees within a seventy-five mile radius of the Plaintiff's primary reported-to work location for at least twenty weeks during the calendar year at issue in this case and/or the prior calendar year.

11.     Plaintiff is a covered employee pursuant to the FMLA, having worked at Defendant Company for more than 12 months and at least 1,250 hours in the 12 months preceding his termination.

## IV.    INTRODUCTION AND SUMMARY

12.     Plaintiff, Michael Fiorello, was employed at Defendant company as an Account Manager, responsible for sales.  He discovered an issue with a software program utilized by Defendant company to analyze how much money was owed to the company under existing contracts for use of its services and software.  This software error would yield inconsistent outputs representing the amount of money Defendant's clients owed the company, and was leveraged by the Defendant to demand, and in some cases extract, money to which Defendant was not entitled under its contracts with clients.

13.     Concerned that this practice was unethical and potentially fraudulent, Plaintiff reported his concern to his supervisor, Thierry Coulibaly.  Coulibaly responded by retaliating against Plaintiff.  The immediate retaliation included unprofessional behavior and consistent and personal berating of the Plaintiff.  The retaliatory conduct only increased over time—and included cutting Plaintiff off from interacting with his colleagues and freezing him out of certain aspects of his job duties.

14.     The abusive conduct associated with that retaliation lead to a resurgence of Plaintiff's psychological symptoms, which had been well-managed for many years.

15.     Plaintiff suffered from ADA qualifying conditions of anxiety and panic disorders, depression, PTSD, and symptoms with overlapping characteristics.  The resurgence of symptoms required Mr. Fiorello to take leave from employment and request reasonable accommodation.

3

When he had gained enough time with the company to qualify for FMLA leave, he took leave under the FMLA.

16.     Adding insult to injury, Plaintiff was then further retaliated against and/or discriminated against for exercising his legal rights under the ADA and FMLA.

17.     He was denied reasonable accommodation, was denied the ability to return to work, and was ultimately terminated for exercising his rights under the law.  Defendant, thus both, interfered with Mr. Fiorello's exercise of rights under the ADA and FMLA, and retaliated against him for such exercise.

18.     The nature of Plaintiff's termination simultaneously constituted a wrongful termination, as public policy clearly supports Plaintiff's exercise of his rights under federal law, as well as his report of what he believed was illegal activity by his employer.

## V.     FACTS

19.     Michael Fiorello was hired by the Defendant on or about November 21, 2021, as an Account Manager.  The general responsibilities of his position included customer/client relations and sales of software.

20.     Mr. Fiorello's base salary at the time of his departure was $134,017.00 annually. Additionally, he received commissions based on sales of software subscriptions and services.  At 100% of Mr. Fiorello's annual quota attainment, he would earn a commission of $90,000.00 for software subscriptions and $12,000.00 for services.  Mr. Fiorello also received employment benefits including, but not limited to, medical insurance and retirement benefits.

21.     For the 2022 tax year, Mr. Fiorello was paid gross wages in the amount of $170,252.81.

22.     Mr. Fiorello suffered from an anxiety/panic disorder and/or similar psychological conditions prior to his employment with Defendant, but his symptoms had been well-controlled and managed by the time he was hired at Defendant company.  He had not suffered a panic attack for roughly two decades prior to his employment with Defendant.

23.     Prior to working for Defendant, Plaintiff had worked in comparable sales positions at other companies, including 15 years at Hewlett-Packard and 6 years at Oracle.

24.     At Defendant company, Mr. Fiorello reported to two supervisors, Thierry Coulibaly and David Thomas, who at all relevant times acted in their capacity as agents of Defendant and within the scope of their employment with Defendant.

25.     At the beginning of the 2022 fiscal year, the salesmen discovered that the company's business forecast for sales had diminished by roughly 50 percent of projections just prior to January 1, 2022.  This meant that Defendant's supervisors like Coulibaly and Thomas were under increased pressure to shore up the anticipated diminished revenue.

26.     In approximately May of 2022, Mr. Fiorello discovered that a reporting tool called Horus, which was used by Defendant to track accounts, was inaccurate, improperly utilized and providing erroneous outputs for client balances owed to Defendant company.

27.     This error meant the Horus program would yield widely ranging outputs for the values of balances owed by client-users for software and services provided by Defendant.

28.     For example, Plaintiff worked the Costco account for Defendant company.  When the Horus program was applied to the Costco account, it could yield balances owed to Defendant that varied by tens-to-hundreds of thousands of dollars, depending only on which day Plaintiff ran the Horus program.  Despite Mr. Fiorello's report of this significant inaccuracy, Coulibaly pressured Plaintiff to simply select the greatest value provided by Horus and to extract as much

money from their clients as possible, regardless of the actual amount due to Defendant under its contracts.

29.    Around the same time that Mr. Fiorello discovered the problem with Horus and that the salesmen discovered that the company's business forecast diminished, Plaintiff's superiors took an aggressive turn in strategy, seeking to pressure customers to renew their contracts with the company and to pay balances in arrears for past periods of alleged noncompliance with their contracts.  The company's management did this through their account managers, like Mr. Fiorello, utilizing the inaccurate Horus outputs.

30.    Plaintiff was thrust into meetings with clients and their attorneys, with the instruction to identify contractual provisions that might vaguely justify Defendant's demand that client pay whatever inflated value the use of Horus arrived at.

31.    Mr. Fiorello's management team—Coulibaly and Thomas—were not only aware of the Horus software defect but relied upon it as the cornerstone of their new strategy to overcharge clients.

32.    Mr. Fiorello reported the issue with Horus and questioned the overcharging of clients directly through verbal communications to his supervisor Coulibaly, upon discovering that it was unreliable and potentially produced fraudulent client balances.  Mr. Fiorello questioned the legality and ethics of using the unreliable Horus data in a deceptive strategy to extract unearned money from clients.

33.    Plaintiff's concerns were reinforced by the negative reception of the new strategy by his clients and their attorneys, who likewise questioned the propriety of Defendant's demand for payment.

34.     Plaintiff raised his concerns to Coulibaly in conversation in approximately May-June of 2022.  Coulibaly's response was to make threatening statements directed at Plaintiff.

35.     For example, when Plaintiff spoke with Coulibaly about his concerns, Coulibaly stated that he now had a "problem" with Plaintiff after he reported this discovery.  Plaintiff explained to Coulibaly that widely ranging Horus outputs suggested that it was unreliable and that Plaintiff thus needed guidance as to how he could determine the true amount of money owed to Defendant.  Coulibaly responded with statements such as, "which one would you pick?" "why is it only you that has this problem?" and "this is the easiest money you will ever make."  When Plaintiff asked Coulibaly direct questions about how he was supposed to rely on these widely ranging Horus outputs, Coulibaly told him, "you don't ask the questions."

36.     Coulibaly was thus pressuring Plaintiff to select the highest output from Horus and present that value to clients as being the amount due for their use of Defendant's services, despite knowing that the outputs were inconsistent and unreliable.  Plaintiff's belief that it was important to determine the actual amount owed was dismissed by Coulibaly, who only emphasized the importance of extracting the maximum possible amount of money from clients rather than the actual amount owed.

37.     The Defendant responded to Plaintiff's concerns by harassing and psychologically demeaning him in retaliation for Plaintiff having made such reports.

38.     After Plaintiff made his report of the potentially fraudulent practice, Defendant's managing employee, Coulibaly, became abusive to Plaintiff and interfered with Plaintiff's ability to perform his job duties.  Coulibaly repeatedly berated Mr. Fiorello and treated him with condescension.  Coulibaly refused to read and/or respond to emails from Plaintiff, was hostile, and tried to isolate Plaintiff both interpersonally and professionally from his job duties.

39.     For example, after Plaintiff reported his concerns to Coulibaly, Coulibaly prohibited Plaintiff from speaking with his Client Services Manager, ("CSM"), Rebecca Wrabella. This communication was a critical element of Plaintiff's job duties without which Plaintiff would be unable to meet his sales goals.  CSM Wrabella was the team member who had all the knowledge concerning clients' contracts, payment history and subscriptions.   Without her, Plaintiff was expected to meet his sales quota without knowing when any given client's subscription was up for renewal, what subscriptions they had paid for, and how much they historically had spent on Defendant's services.

40.     Additionally, following Mr. Fiorello's discovery and disclosure of the problems with Horus, Coulibaly conducted a conference call with the salesmen under him and instructed them not to speak about the Horus issue with anyone outside of that group attending the call.

41.     Coulibaly held regular phone calls with Mr. Fiorello in which Coulibaly would dedicate a half-hour toward informing him that he didn't believe that "this job was right for [Mr. Fiorello]."   In those phone calls, Coulibaly would interrupt the Plaintiff and prevent him from speaking by saying "no, no, no, no," until Mr. Fiorello would submit in silence to Coulibaly's denigration.

42.     Ahead of client meetings, Coulibaly often told Mr. Fiorello exactly what he should say.  Mr. Fiorello would fearfully obey those instructions precisely.  After the meeting Coulibaly would admonish Mr. Fiorello, despite Mr. Fiorello having said precisely what he was told to say.

43.     The Defendant knew or should have known that the Horus data was inaccurate and was unethically and potentially illegally communicated to clients, but Defendant pushed its use for its own financial benefit.

44.     Plaintiff was not the only person to raise concerns about Horus with management. At least one software engineer within the company—Kevin Partington, the designer of the Horus program–also advised management of his concerns with the accuracy of the outputs.

45.     Despite these reports, Defendant continued to improperly use Horus.

46.     Despite the development and progression of the issue with Horus, despite his managers' unacceptable actions towards him, and despite having to undergo intensive psychological maltreatment as a result of those actions, Mr. Fiorello performed his duties well when measured by objective performance figures.

47.     The company's Sales Team Performance metrics for the first three quarters of 2022 (January through September), calculated by October of 2022, indicated that Mr. Fiorello's sales performance was in the 73rd percentile for sales attainment and that he attained 99% of his year-to-date quota.

48.     By August of 2022, Mr. Fiorello should have been ranked 31st out of 101 employees for sales executives across the company's aggregate sales business units; and ranked 3rd out of 11 sales representatives in his global trade management team.

49.     Despite these figures, Mr. Fiorello received a negative performance review in late July of 2022—mere months after he voiced concerns regarding the ethics and legality of the reliance on, and improper use of, the Horus program.

50.     On September 12, 2022, Mr. Fiorello suffered a debilitating panic attack at work. This was the first panic attack Mr. Fiorello had sustained during the preceding two decades.  As a direct and proximate result of the conduct legally attributable to Defendant, Mr. Fiorello's well-treated and managed symptoms were exacerbated to the level of a present medical crisis.

51.     Mr. Fiorello ultimately went on short-term disability on September 22, 2022, due to his deteriorating mental health, a condition attributable to the hostile conduct of his managers, until such time as had worked at Defendant company long enough to qualify for FMLA leave— which he then exercised.

52.     September 22, 2022, was also at the close of the company's third quarter. At that time, Mr. Fiorello had achieved 99 percent of his subscription quota or $374,000 of the $376,000 target, before taking short-term disability leave.

53.     On October 14, 2022, Mr. Fiorello was admitted into an intensive outpatient hospitalization program at Brightside Health, under the care of Erin Clevenger, Ph.D. Plaintiff informed Defendant of this treatment.

54.     On February 6, 2023, Mr. Fiorello filed a formal complaint against Coulibaly with the human resources department at Defendant Company.  Mr. Fiorello reported that Coulibaly was emotionally abusive and created a hostile working environment.  Mr. Fiorello requested reassignment as part of an ADA accommodation, which was denied.

55.     Specifically, within Mr. Fiorello's complaint to Defendant's HR Department he stated:

> …I strongly feel I would be remiss if I were not upfront in sharing serious concerns about my workplace experience that has contributed to my absence.  I have also been advised by my therapist to share some of my concerns as a healing component of my Exposure Response Prevention therapy.  That said, it has taken me a long time to find the courage to lodge this formal complaint against my manager, Thierry Coulibaly, as I am unable to endure any of his abuse anymore.  He has been emotionally abusing me for the past year.  I was unable to manage this problem on my own and was so overwhelmed, that I reached out for medical help earlier in the year that led to my STD.  This is the first time in my 30-year work career that I had to use a STD.  And a first time I have ever had to engage with HR for this type of concern in my entire work history.

Mr. Fiorello's complaint also included reference to retaliation for having reported the Horus issue to Coulibaly.

56.    On February 8, 2023, Unum (Thomson Reuters' third party leave administrator) opened an ADA Leave Time Extension request to extend Mr. Fiorello's leave time due to exhaustion of FMLA benefits.

57.    Mr. Fiorello's target return to work date was February 13, 2023, with a planned gradual ramp-up of hours until March 6, 2023.  He requested to work three half-days for two weeks, and then one week of six-hour days, until March 6th.  Mr. Fiorello additionally requested that he be afforded ten shifts to catch up on emails without being required to complete forecast reports until March 13, 2023.

58.    On February 21, 2023, Mr. Fiorello was informed by Unum that the Defendant company rejected the ADA accommodation return to work plan and that it considered forecast reporting to be an essential function of his job.

59.    Rather than engage in the interactive process to determine whether a reasonable accommodation could be made, as demanded by the ADA, Defendant simply rejected the proposal.

60.    The revelation that Thomson Reuters was denying Mr. Fiorello's plan to return to work triggered his psychological symptoms that were originally instigated by his managers, resulting in emergency medical/mental health treatment on February 22, 2022.

61.    Mr. Fiorello remained on short-term disability, extended to March 27, 2023.

62.    On March 15, 2023, Mr. Fiorello's healthcare provider submitted documentation to Unum recommending that Mr. Fiorello remain on leave until the end of June.

63.    On March 23, 2023, Plaintiff submitted a request to extend leave until June 30, 2023.

64.     Ignoring this leave time extension request, ignoring Mr. Fiorello's attempts to return to work with accommodation in March, and ignoring the submission by Mr. Fiorello's healthcare provider suggesting he could return to work after June, the Defendant company sent him correspondence on April 6, 2023, indicating they intended to terminate his employment.

65.     In that correspondence, Defendant justified Mr. Fiorello's termination by claiming that he was unable to return to work, and that he, "[had] not provided with reasonable medical certainty the expected duration of additional needed leave."

66.     On May 1, 2023, Mr. Fiorello suffered suicidal ideation. This was caused not only by the conduct of his managers, which instigated his mental health conditions, but also by the company's refusal to make reasonable accommodation available to him.

67.     On May 4, 2023, Mr. Fiorello received an official termination letter from Jesse Mayle of Defendant's Human Resources Department, indicating that employment would be terminated effective May 12, 2023.

68.     That correspondence cited Mr. Fiorello's inability to return to work "with or without accommodations," and his failure to provide the "expected duration of any additional needed leave."

69.     This was despite Mr. Fiorello's attempt to return to work with an accommodation of gradually increasing hours and duties, despite his request for an accommodation of a simple transfer to another supervisor's team, and despite his healthcare provider's submission of expected leave time needed.

70.     In a sick display of twisted irony, Defendant chose May 12th, the company's designated mental health awareness day, as the effective date of Mr. Fiorello's termination.

71.    On May 12, 2023, Mr. Fiorello suffered a major depressive episode as a direct consequence of the stressors of this situation created by Defendant's conduct.

72.    Mr. Fiorello continues to suffer harm caused by his former employer, including, but not limited to, financial losses stemming from his termination.

## VI.    LEGAL CLAIMS

### COUNT I

### Discrimination in Violation of the Americans with Disabilities Act, 42 U.S.C 12112 et al., and N.H. RSA 354-A

73.    The Plaintiff repeats and realleges each allegation contained in the preceding paragraphs.

74.    Plaintiff suffered from diagnosed psychological and medical conditions which substantially limited major life activities, including concentrating, thinking, interacting with others, and working.

75.    Thus, Plaintiff was at all relevant times disabled within the meaning of the ADA and N.H. RSA 354-A. *See* 42 U.S.C. § 12102; RSA 354-A:2, IV.

76.    At all relevant times, Plaintiff was able to perform the essential functions of his job, with or without reasonable accommodations, and/or could perform the essential functions of his job with time-limited reasonable accommodation.

77.    Plaintiff disclosed his disability condition to the Defendant.

78.    Defendant regarded Plaintiff as having an ADA-qualifying disability.

79.    Plaintiff utilized a reasonable accommodation in the form of a brief medical leave for treatment and recovery.

80.    Plaintiff further sought accommodation in the form of a gradually increasing workload upon his return.

81.     Plaintiff sought accommodation in the form of a transfer to another supervisor's responsibility.

82.     Plaintiff was cleared to return to work on February 13, 2023, with a planned gradual ramp-up of hours until March 6, 2023.

83.     The Defendant refused to make a reasonable accommodation.

84.     Plaintiff remained on leave, and it was expected that he could return without further accommodation—as was demanded by Defendant via their denial of his gradual return—at the end of June 2023.

85.     Based on Plaintiff's disability condition, his employer terminated him soon thereafter on May 12, 2023.

86.     Defendant's actions constitute unlawful discrimination on the basis of disability, in violation of the ADA and N.H. RSA 354-A.

87.     As a direct and proximate result of the Defendant's disability discrimination, the Plaintiff has suffered and continues to suffer damages including, without limitation, lost wages, lost benefits, lost earnings capacity, emotional distress, humiliation, inconvenience, and loss of life enjoyment.  Furthermore, the Defendant acted with malice and/or with reckless indifference to Plaintiff's federally protected rights, which entitles him to punitive damages.  The Defendant also acted with willful or reckless disregard for the Plaintiff's rights under N.H. RSA 354-A, entitling him to enhanced compensatory damages pursuant to New Hampshire law.  The Plaintiff is further entitled to attorney's fees, interest, and costs.

## COUNT II
### Retaliation in Violation of the Americans with Disabilities Act, 42 U.S.C. 12112 et al. and N.H. RSA 354-A

88.    The Plaintiff repeats and realleges each allegation contained in the preceding paragraphs.

89.    Plaintiff engaged in conduct protected by the ADA and N.H. RSA 354-A by informing his employer of his disabilities, by attempting to engage in the interactive process, by seeking reasonable accommodation, and by utilizing the reasonable accommodation.

90.    Plaintiff also engaged in conduct protected by the ADA and N.H. RSA 354-A when he filed a complaint against his supervisor with Defendant's human resources department, in which he requested a reasonable accommodation consisting of a transfer to another supervisor's team.

91.    The Defendant was aware of this protected activity.

92.    Defendant regarded Plaintiff as having an ADA-qualifying disability.

93.    In response to the Plaintiff's protected activity, the Defendant erroneously scrutinized his ability to work and took adverse employment action against him—ultimately resulting in Plaintiff's termination.

94.    Thus, the Defendant employer is liable for retaliation in violation of the ADA and N.H. RSA 354-A.

95.    As a direct and proximate result of the Defendant's unlawful retaliation against the Plaintiff, the Plaintiff has suffered and continues to suffer damages, including, without limitation, lost wages, lost benefits, lost earning capacity, emotional distress, humiliation, inconvenience, and loss of life enjoyment.  Furthermore, by terminating the Plaintiff in retaliation for his protected conduct, the Defendant acted with malice and/or with reckless indifference to Plaintiff's federally protected rights, entitled him to punitive damages.  The Defendant also acted with willful or reckless disregard for the Plaintiff's rights under N.H. RSA 354-A, entitling Plaintiff to enhanced

compensatory damages pursuant to New Hampshire law. The Plaintiff is further entitled to attorney's fees, interest, and costs.

### COUNT III
**Retaliation and Interference in Violation of the Family and Medical Leave Act**

96.     The Plaintiff repeats and realleges each allegation contained in the preceding paragraphs.

97.     Plaintiff was a full-time employee of Defendant company, who by November of 2022, had worked 12 months and over 1,250 hours, thus he was an eligible employee under the FMLA.

98.     At all relevant times, Defendant was an employer within the meaning of the FMLA because it employed fifty or more employees within a seventy-five mile radius of the Plaintiff's primary reported-to work location for at least twenty weeks during the calendar year at issue in this case and/or the prior calendar year.

99.     Plaintiff suffered an exacerbation of his diagnosed mental health conditions which required both inpatient care, and continuing treatment by his healthcare provider. Thus, Plaintiff suffered from a serious health condition under the meaning of the FMLA, pursuant to 29 C.F.R. §§ 825.114, 115.

100.     Plaintiff took FMLA leave, which was designated and approved by Defendant as leave under the FMLA, after which time Plaintiff had exhausted his FMLA leave entitlement.

101.     Soon thereafter, on May 12, 2023, Defendant terminated Plaintiff's employment.

102.     Defendant's decision to terminate Plaintiff was substantially motived by his exercise of rights under the FMLA.

103.     Defendant additionally erroneously scrutinized Plaintiff's ability to work.

104.    Defendant's conduct, therefore, constitutes retaliation for, and interference with, Plaintiff's exercise of rights secured under the FMLA, in violation of 29 U.S.C. § 2615(a) & (b).

105.    As a direct and proximate result of Defendant's retaliation against the Plaintiff, the Plaintiff claims all damages to which he is entitled, including but not limited to, lost wages, attorney's fees, interest and costs, and liquidated damages due to the Defendant violating the FMLA willfully and/or in bad faith.

## COUNT IV
### Wrongful Termination

106.    The Plaintiff repeats and realleges each allegation contained in the preceding paragraphs.

107.    Public policy and both state and federal law supported Mr. Fiorello's disclosure of his disabilities/serious health conditions to his employer, engaging in the interactive process concerning his need for medical leave as well as requesting a transfer to another supervisor's responsibility, and then utilizing leave for treatment, which the ADA, FMLA and N.H RSA 354-A protected.

108.    Public policy and state law supported Mr. Fiorello's report to management regarding the ethical threats posed by the Horus system and management's connected deceptive business practices, which NH RSA 275-E:2 protects.

109.    Public policy supported Mr. Fiorello filing a complaint against his supervisor with Defendant's human resources department his supervisor's abusive conduct and creation of a hostile work environment.

110.    The Defendant took adverse employment action against the Plaintiff by erroneously scrutinizing his ability to work, refusing to permit him to return to work, and ultimately by terminating his employment.

111.    As a direct and proximate result of the Defendant's conduct, Plaintiff suffered and continues to suffer damages, including but not limited to:  lost wages, lost benefits, emotional distress, humiliation, reputational harm, inconvenience, lost earning capacity, and loss of life enjoyment.  The Plaintiff is also entitled to enhanced compensatory damages based on the wanton, malicious, and oppressive nature of the Defendant's conduct.

<u>**COUNT V**</u>
**Retaliation in Violation of New Hampshire's Whistleblower Protection Act, RSA 275-E:2**

112.    The Plaintiff repeats and realleges each allegation contained in the preceding paragraphs.

113.    The Plaintiff was employed by the Defendant, and at all relevant times was an employee in good standing.

114.    The Defendant, through its agents, harassed, intimidated, discharged, threatened, and/or otherwise discriminated against Mr. Fiorello regarding terms, conditions, and/or privileges of employment in violation of RSA 275-E:2

115.    This retaliation was the result of Mr. Fiorello's good-faith reports of what he had reasonable cause to believe were violations of laws, including those prohibiting fraud and deceptive business practices.

116.    A reasonable employer would have understood Mr. Fiorello's expression of concern regarding the use of the Horus system to constitute reports of violations of the law.

117.    Thus, the Defendant is liable for unlawful retaliation under N.H. RSA 275-E:2.

118.    Mr. Fiorello is entitled to damages, including without limitation, lost wages and benefits, as well as reasonable attorney's fees and litigation costs.

**WHEREFORE**, the Plaintiff, Michael Fiorello, respectfully prays this Honorable Court:

A.    Schedule this matter for trial by jury;

B.      Find the Defendant liable for each count alleged herein;

C.      Award the Plaintiff all damages to which he is entitled, including enhanced

compensatory damages, punitive damages and liquidated damages;

D.      Award the Plaintiff his reasonable attorney's fees and costs; and

E.      Grant such other and further relief as is just and equitable.

Respectfully submitted,

Michael J. Fiorello, Plaintiff
By his attorneys,
Lehmann Major List, PLLC

Date:  August 26, 2025              By:    /s/Matthew St. Hilaire_____
                                            Matthew R. St. Hilaire, Esq.
                                            NH Bar No. 278826
                                            Richard J. Lehmann, Esq.
                                            NH Bar No. 9339
                                            6 Garvins Falls Road
                                            Concord, NH  03301
                                            (603) 715-2516
                                            matt@nhlawyer.com